# COMPLAINT
# EXHIBIT 1



**NATIONAL STUDENT**
LEGAL DEFENSE NETWORK

1015 15th St. NW,  Suite 600
Washington, DC 20005
www.nsldn.org

September 5, 2018

**VIA ELECTRONIC MAIL**
Director, Information Collection Clearance Division
Office of the Chief Privacy Officer
Office of Management
U.S. Department of Education
400 Maryland Avenue S.W.
LBJ, Mailstop L-OM-2-2E319
Washington, D.C. 20202
OMInformationQuality@ed.gov

Principal Deputy Assistant Secretary Office of Management
U.S. Department of Education
400 Maryland Avenue S.W.
LBJ, Room 2W311
Washington, D.C. 20202
OMInformationQualityRequests@ed.gov

    **ATTN: Information Quality Request**

To whom it may concern:

This is a Petition for Correction and Disclosure ("Petition") in accordance with the Information Quality Act ("IQA"), the information and quality guidelines issued by the Office of Management and Budget ("OMB"), and the IQA Guidelines[1] issued by the U.S. Department of Education (the "Department").[2]

This Petition focuses on the Department's recent publication of a Notice of Proposed Rulemaking ("NPRM") that proposes to "rescind" the Department's Gainful Employment regulation.[3] The NPRM includes an abundance of factual claims without disclosing the underlying sources or methodologies, a clear failure to comply with the IQA. Where the NPRM does cite sources, it still violates the IQA by repeatedly stating conclusions that are not clearly supported by the evidence. These failures render meaningless the entire purpose of the public comment period—*i.e.*, to allow the Department to properly determine how to ensure that certain institutions of higher education— as a condition of their eligibility to receive Title IV, Higher Education Act ("HEA") program

---

[1]     *See* Exh. A (U.S. Dep't of Educ., "Information Quality Guidelines" (2002), *available at:* https://www2.ed.gov/policy/gen/guid/iq/infoqualguide.pdf) (hereinafter the "ED Guidelines")).

[2]     The ED Guidelines do not provide clear instructions on how to submit this sort of petition. In the PDF version of the ED Guidelines (https://www2.ed.gov/policy/gen/guid/iq/infoqualguide.pdf), the Department instructs the public to submit IQA correction requests to the Principal Deputy Assistant for Management. In the non-PDF version (https://www2.ed.gov/policy/gen/guid/iq/iqg_5a.html), the Department instructs the public to submit IQA correction requests to the Director, Information Collection Clearance Division. Out of an abundance of caution, we are providing it to both recipients.

[3]     83 Fed. Reg. 40,167 (Aug. 14, 2018).

Principal Deputy Assistant Secretary Office of Management &
Director, Information Collection Clearance Division
U.S. Department of Education
Page 2 of 14
September 5, 2018

funds—prepare students for gainful employment in a recognized occupation.  As a result, potential commenters, including NSLDN,[4] will not be able to provide effective feedback on the Department's proposed rescission.

Because NSLDN stands to suffer harm from the continued dissemination of this information, it is an "affected person" under the IQA and may, therefore, submit this Petition.  Although the ED Guidelines do not define "affected,"[5] NSLDN will be harmed by the disseminated information, particularly because it uses the published information for a variety of purposes.  Not only does NSLDN intend to submit written comments in response to the NPRM, but also NSLDN actively studies, researches, and proposes student-focused policies at the state and local level.  By disseminating information that fails to meet the basic standards of the IQA, the Department is infringing upon NSLDN's significant interest in ensuring that the Department relies upon and publishes only accurate and reliable data in its communications with the public.

Given the current inaccuracies in the Department's NPRM on Gainful Employment, NSLDN requests that the Department rescind this NPRM immediately and, if the Department desires, correct and reissue it with information that complies with the IQA.

### 1.  Background on the 2014 Gainful Employment Regulation

Finalized in 2014, the Gainful Employment regulation was expressly "intended to address growing concerns about educational programs" that "are required by statute to prepare students for gainful employment in a recognized occupation . . .[,] but instead are leaving students with unaffordable levels of loan debt in relation to their earnings."[6]  More specifically, the Department was concerned that covered "gainful employment programs"—also known as "GE programs"—"[d]o not train students in the skills they need to obtain jobs in the occupation for which the program purports to provide training."[7]  The Department also worried that these programs "experience a high number of withdrawals or 'churn' because relatively large numbers of students enroll, but few, or none, complete the program, which can often lead to default."[8]  In other words, the Gainful Employment regulation aimed to crack down on GE programs that were both ineffective and expensive, often leaving students with debts that they could never hope to repay.

Motivated by these concerns, the Department established a regulatory framework with two key components: accountability and transparency.  The "accountability framework" defined "what it means to prepare students for gainful employment in a recognized occupation by establishing

---

[4]        NSLDN is a non-profit, nonpartisan organization that works, through litigation and advocacy, to advance students' rights to educational opportunity and to ensure that higher education provides a launching point for economic mobility.

[5]        *See generally* U.S. Dep't of Educ., "Information Quality Guidelines" (2002), *available at:* https://www2.ed.gov/policy/gen/guid/iq/infoqualguide.pdf.

[6]        79 Fed. Reg. 64,890 (Oct. 31, 2014).

[7]        *Id.*

[8]        *Id.*

Principal Deputy Assistant Secretary Office of Management &
Director, Information Collection Clearance Division
U.S. Department of Education
Page 3 of 14
September 5, 2018

measures by which the Department will evaluate whether a GE program remains eligible" to receive
federal student aid funds.[9]  The "transparency framework" aimed to "increase the quality and
availability of information about the outcomes of students enrolled in GE programs" based on the
assumption that "[b]etter outcomes information will benefit . . . [s]tudents, prospective students, and
their families, as they make critical decisions about their educational investments,"[10] as well as the
public, taxpayers, the government, and institutions of higher education.[11]

The Department relied upon extensive peer-reviewed, statistical information to inform its design of
the 2014 Gainful Employment rule.  For example, the Department provided data on the high tuition
costs, poor outcomes, and deceptive practices at some institutions in the for-profit sector to
illustrate why its concern with GE programs at those institutions in particular was justified, rather
than biased.[12]  In addition, the Department relied upon multiple studies and authorities to set the
D/E rates measures at twenty percent for discretionary income and eight percent for annual
earnings.[13]  Finally, the Department conducted its own regression analyses to explore the influence
of demographic factors—such as socioeconomic status, race and ethnicity, gender, marital status,
and family history of pursuing higher education—on annual earnings.[14]  These analyses showed that
student demographics were "not strong predictors" of which programs would pass or fail the D/E
rates measures.[15]  Because of this reliance on peer-reviewed, scientific evidence-based research, the
Department easily met its obligations under the IQA.

In addition, the Department met its obligations to engage in reasoned decision-making under the
Administrative Procedure Act ("APA").  Shortly after the promulgation of the 2014 Gainful
Employment rule, two separate lawsuits attacked the rule's validity.  Ultimately, both federal district
courts that presided over these lawsuits, as well as the United States Court of Appeals for the D.C.
Circuit that heard one of the lawsuits on appeal, upheld the Gainful Employment regulation in its
entirety.[16]

---

[9]    79 Fed. Reg. at 64,890.
[10]   *Id.* at 64,890.
[11]   *Id.*
[12]   79 Fed. Reg. at 64,904-08.
[13]   *Id.* at 64,919-22.
[14]   *Id.* at 64,910, 65,037-74.
[15]   *Id.* at 64,910.
[16]   *See, e.g., Ass'n of Private Sector Coll. & Univ. v. Duncan*, 110 F. Supp. 3d 176 (D.D.C. 2015), *aff'd*, 640 F. App'x 5
(D.C. Cir. 2016); *Ass'n of Proprietary Colleges v. Duncan*, 107 F. Supp. 3d 332, 341 (S.D.N.Y. 2015).  Two years later,
however, in June 2017, a federal judge granted narrow relief to a trade association for cosmetology schools, which
argued that the GE rule was arbitrarily applied to cosmetology school graduates because those graduates tended to
underreport their income earned from tips.  Although the judge narrowly tailored the decision to members of the
association only so as to avoid "upending the entire GE regulatory scheme," *Am. Ass'n of Cosmetology Sch. v. DeVos*, 258
F. Supp. 3d 50 (D.D.C. 2017), the Department later cited this decision to justify delaying enforcement of the entire
Gainful Employment regulation, *see* 82 Fed. Reg. 39,362 (Aug. 18, 2017).  That delay is currently being challenged by a
group of state Attorneys General.  *See State of Maryland v. Dep't of Educ.*, No. 1:17-cv-0239 (D.D.C. 2017).

Principal Deputy Assistant Secretary Office of Management &
Director, Information Collection Clearance Division
U.S. Department of Education
Page 4 of 14
September 5, 2018

The NPRM stands in stark contrast to the Department's earlier rulemaking efforts, however. As explained further below, the Department's proposed rescission of the 2014 rule relies upon inaccurate, misleading, and unsourced information in violation of the IQA.

### 2.  Grounds for Disclosure and Correction under the IQA

The IQA and its implementing guidelines require that information disseminated to the public by federal agencies be accurate, reliable, and unbiased. Indeed, the IQA—passed by Congress in 2001—directed the OMB to require that each applicable federal agency "issue guidelines ensuring and maximizing the quality, objectivity, utility, and integrity of information (including statistical information)" that the agency disseminated.[17] In response to the statute, OMB issued final guidelines implementing the IQA and requiring agencies to publish their own guidelines no later than October 1, 2002.[18]

Similar to OMB's Guidelines, the ED Guidelines apply to "information," *i.e.*, "*any* communication or representation of knowledge, such as facts or data, in any medium or form" that is "disseminat[ed]" to the public.[19] Exh. A at 1 (emphasis added). The ED Guidelines affirm that, "[t]o make sound decisions, the Department intends to accept and use only information that is accurate and reliable." Exh A at 2. Furthermore, the ED Guidelines make clear that it is similarly "important that the information the Department [itself] disseminates be accurate and reliable." *Id.* at 1.

The Department uses three factors to assess the quality of information it disseminates: "utility, objectivity, and integrity." Exh. A at 4. As relevant here, the ED Guidelines define objectivity as follows:

> Objectivity refers to the accuracy, reliability, and unbiased nature of information. It is achieved by using reliable information sources and appropriate techniques to prepare information products. Objectivity involves both the content and the presentation of the information. Content should be complete, include documentation of the source of any information used, as well as, when appropriate, a description of the sources of any errors in the data that may affect the quality of the information product.

*Id.* at 5 (emphasis removed). The ED Guidelines then go on to list what each dissemination of general information should include in order to be considered "objective," such as:

- "[D]raw[ing] upon peer-reviewed, scientific evidence-based research that is appropriately documented;"

---

[17]     Consolidated Appropriations Act, Pub. L. No. 106-554, § 515(a), 114 Stat. 2763 (2001).
[18]     67 Fed. Reg. 8,452 (Feb. 22, 2002).
[19]     *See also* 67 Fed. Reg. at 8,453 (establishing that "information" means "any communication or representation of knowledge such as facts or data").

Principal Deputy Assistant Secretary Office of Management &
Director, Information Collection Clearance Division
U.S. Department of Education
Page 5 of 14
September 5, 2018

- "Clearly identify[ing] data sources;" [*and*]
- "Confirm[ing] and document[ing] the reliability of the data, and acknowledg[ing] any shortcoming or explicit errors in any data that is included."

*Id.* at 5.  Additionally, the ED Guidelines state that, to be considered "objective," each dissemination of research and evaluation information should:

- "Have a research study approach or data collection technique that is well thought out, designed to use state of the art methodologies in the data collection, and be clearly described;"
- Present conclusions that are strongly supported by the data;" [*and*]
- "Undergo peer review."

*Id.* at 6.

Beyond objectivity, the Department has also imposed heightened requirements for information quality when that information is deemed "particularly influential."  *See* Exh. A at 9 ("Government information that is particularly influential needs to meet higher quality standards, and in particular must be reproducible.").  Per the ED Guidelines, information is "influential" if the Department determines "that the information is reasonably likely to have a clear and substantial impact on public policies or private sector decisions if disseminated."  *Id.*  In the instant case, the Department has already determined that the NPRM's proposed rescission constitutes an "economically significant regulatory action" under Executive Order 12,866.[20]  Thus, the information contained in the NPRM is "influential."  Pursuant to the ED Guidelines, then, that information "must be accompanied by supporting documentation that allows an external user to understand clearly the information and be able to reproduce it, or understand the steps involved in producing it."  Exh. A at 10.

Despite the clear standards set forth in both the ED Guidelines and the IQA, the Department's NPRM is filled with examples of information that are not supported by sources, do not stand for the proposition cited, fail to explain the methodology used, or otherwise are not "accompanied by information that allows an external user to understand clearly the information and be able to reproduce it, or understand the steps involved in producing it."

### 3.   Specific IQA Violations

The chart below provides a specific description of information disseminated in the NPRM that violates the IQA, as well as the basis for each IQA violation, including, where appropriate, an explanation of why a particular statement contains inaccurate, unreliable, or misleading information.

| NPRM STATEMENT | IQA VIOLATION |
| --- | --- |
| "The first D/E rates were published in 2017, and the Department's analysis of those rates | 1.   Fails to clearly describe the research study approach or data collection technique |

---

[20]        *See* 83 Fed. Reg. at 40,177.

Principal Deputy Assistant Secretary Office of Management &
Director, Information Collection Clearance Division
U.S. Department of Education
Page 6 of 14
September 5, 2018

| | |
|---|---|
| raises concerns about the validity of the metric, and how it affects opportunities for Americans to prepare for high-demand occupations in the healthcare, hospitality, and personal services industries, among others."[21] | 2. Fails to clearly identify data sources<br>3. Fails to confirm and document the reliability of the data and acknowledge any shortcomings or explicit errors<br>4. Fails to undergo peer review<br>5. Fails to "be accompanied by supporting documentation that allows an external user to understand clearly the information and be able to reproduce it, or understand the steps involved in producing it" |
| "In promulgating the 2011 and 2014 regulations, the Department cited as justification for the 8 percent D/E rates threshold a research paper published in 2006 by Baum and Schwartz that described the 8 percent threshold as a commonly used mortgage eligibility standard.  However, the Baum & Schwartz paper makes clear that the 8 percent mortgage eligibility standard 'has no particular merit or justification' when proposed as a benchmark for manageable student loan debt. . . . Upon further review, we believe that the recognition by Baum and Schwartz that the 8 percent mortgage eligibility standard 'has no particular merit or justification' when proposed as a benchmark for manageable student loan debt is more significant than the Department previously acknowledged and raises questions about the reasonableness of the 8 percent threshold as a critical, high-stakes test of purported program performance."[22] | 1. Fails to present conclusions that are strongly supported by the data<br>  a. This failure has been highlighted recently by Sandy Baum, the co-author of the 2006 study cited by the Department.  In that post, Baum stated that "the Department of Education has misrepresented my research, creating a misleading impression of evidence-based policymaking.  The Department cites my work as evidence that the GE standard is based on an inappropriate metric, but the paper cited in fact presents evidence that would support making the GE rules stronger."[23]<br>  b. Baum further asserts that "[the Department is] correct that we were skeptical of [the 8 percent] standard for determining affordable payments for individual borrowers, but incorrect in using that skepticism to defend repealing the rule.  In fact, our examination of a range of evidence about reasonable debt burdens for students would best be interpreted as supporting a stricter standard."[24]  That is because Baum and her co-author's |

---

[21]     *Id.* at 40,171.
[22]     *Id.*
[23]     Sandy Baum, "DeVos Misrepresents the Evidence in Seeking Gainful Employment Deregulation," *Urban Wire: Education and Training* (Aug. 22, 2018), https://www.urban.org/urban-wire/devos-misrepresents-evidence-seeking-gainful-employment-deregulation.
[24]     *Id.*

Principal Deputy Assistant Secretary Office of Management &
Director, Information Collection Clearance Division
U.S. Department of Education
Page 7 of 14
September 5, 2018

| | |
|---|---|
| | "research set a guideline for a level of debt payments *no individual student* should exceed.  Under GE, half of a program's graduates could exceed this limit before sanctions would kick in."[25] <br><br> c.   A complete copy of Baum's blog post is attached hereto as Exhibit B. |
| "Research published subsequent to the promulgation of the GE regulations adds to the Department's concern about the validity of using D/E rates as to determine whether or not a program should be allowed to continue to participate in title IV programs."[26] | 1.   Fails to identify data sources, including whether it is peer-reviewed and scientific evidence-based <br> 2.   Fails to confirm and document the reliability of the data and acknowledge any shortcomings or explicit errors <br> 3.   Fails to "be accompanied by supporting documentation that allows an external user to understand clearly the information and be able to reproduce it, or understand the steps involved in producing it" |
| "[T]he highest quality programs could fail the D/E rates measures simply because it costs more to deliver the highest quality program and as a result the debt level is higher."[27] | 1.   Fails to identify data sources <br> 2.   Fails to "be accompanied by supporting documentation that allows an external user to understand clearly the information and be able to reproduce it, or understand the steps involved in producing it" |
| "Other research findings suggest that D/E rates-based eligibility creates unnecessary barriers for institutions or programs that serve larger proportions of women and minority students.  Such research indicates that even with a college education, women and minorities, on average, earn less than white men who also have a college degree, and in many cases, less than white men who do not have a college degree."[28] | 1.   Fails to draw upon peer-reviewed sources <br> 2.   Fails to acknowledge any shortcomings or explicit errors in the data <br> 3.   Fails to present conclusions that are strongly supported by the data <br> a.   Indeed, the source cited by the Department does not draw this same conclusion.  For example, the cited table appears to relate to graduates of *bachelor's degree* programs, and not gainful employment programs. <br> 4.   Fails to "be accompanied by supporting documentation that allows an external user |

---

[25]      *Id.*
[26]      83 Fed. Reg. at 40,171.
[27]      *Id.*
[28]      *Id.* (citing Jennifer Ma, Matea Pender, & Meredith Welch, "Education Pays 2016: The Benefits of Higher Education for Individuals and Society," *CollegeBoard Trends in Higher Education Series* Figure 2.4 (2016), *available at:* https://trends.collegeboard.org/sites/default/files/education-pays-2016-full-report.pdf).

Principal Deputy Assistant Secretary Office of Management &
Director, Information Collection Clearance Division
U.S. Department of Education
Page 8 of 14
September 5, 2018

| | |
|---|---|
| | to understand clearly the information and be able to reproduce it, or understand the steps involved in producing it" |
| "[D]ue to a number of concerns with the calculation and relevance of the debt level included in the rates[,] we do not believe that the D/E rates measure achieves a level of accuracy that it should alone determine whether or not a program can participate in title IV programs."[29] | 1. Fails to clearly describe the research study approach<br>2. Fails to identify data sources<br>3. Fails to confirm and document the reliability of the data<br>4. Fails to undergo peer review<br>5. Fails to "be accompanied by supporting documentation that allows an external user to understand clearly the information and be able to reproduce it, or understand the steps involved in producing it" |
| "[I]ncreased availability of [income-driven] repayment plans with longer repayment timelines is inconsistent with the repayment assumptions reflected in the shorter amortization periods used for the D/E rates calculation in the GE regulations."[30] | 1. Fails to rely upon peer-reviewed, scientific evidence-based research<br>2. Fails to identify data sources<br>3. Fails to confirm and document the reliability of the data<br>4. Fails to "be accompanied by supporting documentation that allows an external user to understand clearly the information and be able to reproduce it, or understand the steps involved in producing it" |
| "[A] program's D/E rates can be negatively affected by the fact that it enrolls a large number of adult students who have higher Federal borrowing limits, thus higher debt levels, and may be more likely than a traditionally aged student to seek part-time work after graduation in order to balance family and work responsibilities."[31] | 1. Fails to rely upon peer-reviewed, scientific evidence-based research<br>2. Fails to identify data sources<br>3. Fails to confirm and document the reliability of the data |
| "[I]t is the cost of administering the program that determines the cost of tuition and fees."[32] | 1. Fails to rely upon peer-reviewed, scientific evidence-based research<br>2. Fails to identify data sources<br>3. Fails to confirm and document the reliability of the data<br>4. Fails to "be accompanied by supporting documentation that allows an external user to understand clearly the information and |

---

[29]   *Id.*
[30]   *Id.* at 40,172.
[31]   *Id.*
[32]   *Id.*

Principal Deputy Assistant Secretary Office of Management &
Director, Information Collection Clearance Division
U.S. Department of Education
Page 9 of 14
September 5, 2018

|  |  |
|---|---|
|  | be able to reproduce it, or understand the steps involved in producing it" |
| "Programs that serve large proportions of adult learners may have very different outcomes from those that serve large proportions of traditionally aged learners."[33] | 1. Fails to rely upon peer-reviewed, scientific evidence-based research<br>2. Fails to identify data sources<br>3. Fails to confirm and document the reliability of the data<br>4. Fails to "be accompanied by supporting documentation that allows an external user to understand clearly the information and be able to reproduce it, or understand the steps involved in producing it" |
| "[T]he first set of D/E rates, published in 2016, revealed that the D/E rates, and particularly earnings, vary significantly from one occupation to the next, and across geographic regions within a single occupation."[34] | 1. Fails to clearly describe the research study approach<br>2. Fails to confirm and document the reliability of the data<br>3. Fails to undergo peer review<br>4. Fails to "be accompanied by supporting documentation that allows an external user to understand clearly the information and be able to reproduce it, or understand the steps involved in producing it" |
| "Data discussed during the third session of the most recent negotiated rulemaking demonstrated that even a small change in student loan interest rates could shift many programs from a 'passing' status to 'failing,' or vice versa, even if nothing changed about the programs' content or student outcomes."[35] | 1. Fails to clearly describe the research study approach and data collection technique<br>2. Fails to identify data sources<br>3. Fails to confirm and document the reliability of the data<br>4. Fails to undergo peer review<br>5. Fails to "be accompanied by supporting documentation that allows an external user to understand clearly the information and be able to reproduce it, or understand the steps involved in producing it" |
| "Table 1—Number and Percentage of GE 2015 Programs That Would Pass, Fail, or Fall into the Zone Using Different Interest Rates"[36] | 1. Fails to clearly describe the research study approach and data collection technique<br>2. Fails to identify data sources<br>3. Fails to confirm and document the reliability of the data<br>4. Fails to undergo peer review |

---

[33]    *Id.*
[34]    *Id.*
[35]    *Id.*
[36]    *Id.*

Principal Deputy Assistant Secretary Office of Management &
Director, Information Collection Clearance Division
U.S. Department of Education
Page 10 of 14
September 5, 2018

| | |
|---|---|
| | 5. Fails to "be accompanied by supporting documentation that allows an external user to understand clearly the information and be able to reproduce it, or understand the steps involved in producing it" |
| "[T]he Department now recognizes that assigning a 10-year amortization period to graduates of certificate and associate degree programs for the purpose of calculating D/E rates creates is an unacceptable and unnecessary double standard since the REPAYE plan regulations promulgated in 2015 provide a 20-year amortization period for those same graduates."[37] | 1. Fails to draw upon peer-reviewed, scientific evidence-based research |
| "There is significant variation in methodologies used by institutions to determine and report in-field job placement rates, which could mislead students into choosing a lower performing program that simply appears to be higher performing because a less rigorous methodology was employed to calculate in-field job placement rates."[38] | 1. Fails to clearly describe the research study approach and data collection technique<br>2. Fails to clearly identify data source<br>3. Fails to "be accompanied by supporting documentation that allows an external user to understand clearly the information and be able to reproduce it, or understand the steps involved in producing it" |
| "The Department also believes that it underestimated the burden associated with distributing the disclosures directly to prospective students. . . . A negotiator representing financial aid officials confirmed our concerns, stating that large campuses, such as community colleges that serve tens of thousands of students and are in contact with many more prospective students, would not be able to, for example, distribute paper or electronic disclosures to all the prospective students in contact with the institution."[39] | 1. Fails to draw upon peer-reviewed, scientific-evidence based research<br>2. Fails to confirm and document the reliability of the data |
| "The Department believes that the best way to provide disclosures to students is through a data tool that is populated with data that comes directly from the Department, and that allows prospective students to compare all institutions | 1. Fails to draw upon peer-reviewed, scientific evidence-based research<br>2. Fails to identify data sources<br>   a. Specifically, in the 2014 rule, the Department stated that it "would |

---

[37] *Id.* at 40,172-73.
[38] *Id.* at 40,173.
[39] *Id.*

Principal Deputy Assistant Secretary Office of Management &
Director, Information Collection Clearance Division
U.S. Department of Education
Page 11 of 14
September 5, 2018

| | |
|---|---|
| through a single portal, ensuring that important consumer information is available to students while minimizing institutional burden."[40] | conduct consumer testing" to determine how to make student disclosures as meaningful as possible.[41] The NPRM fails to acknowledge whether such testing occurred, including the results of that testing. The NPRM also fails to state any other basis for the Department's conclusions. |
| "[T]he Department does not believe it is appropriate to attach punitive actions to program-level outcomes published by some programs but not others.  In addition, the Department believes that it is more useful to students and parents to publish actual median earnings and debt data rather than to utilize a complicated equation to calculate D/E rates that students and parents may not understand and that cannot be directly compared with the debt and earnings outcomes published by non-GE programs."[42] | 1. Fails to draw upon peer-reviewed, scientific evidence-based research<br>2. Fails to identify data sources |
| "The Department has reviewed additional research findings, including those published by the Department in follow-up to the Beginning Postsecondary Survey of 1994, and determined that student demographics and socioeconomic status play a significant role in determining student outcomes."[43] | 1. Fails to identify data sources<br>   a. Specifically, the website cited by the Department links to the Beginning Postsecondary Survey of 1994's findings, and not the "additional research" mentioned by the Department, including the Department's own "follow-up."<br>2. Fails to confirm and document the reliability of the data<br>3. Fails to "be accompanied by supporting documentation that allows an external user to understand clearly the information and |

---

[40]        *Id.*

[41]        *See, e.g.*, 34 C.F.R. §§ 668.410(a)(3), 668.412(a).  *See also* 79 Fed. Reg. 64,890, 64,966 (Oct. 31, 2014) ("The regulations include text for the student warnings.  The Secretary will use consumer testing to inform any modifications to the text that have the potential to improve the warning's effectiveness.  As a part of the consumer testing process, we will seek input from a wide variety of sources[.]"); *id.* at 64,969 (noting that while "direct delivery" of warnings to students "make it most likely that students receive . . . and review" the information, the Department would conduct consumer testing regarding the "most effective delivery methods").

[42]        83 Fed. Reg. at 40,174.

[43]        *Id.*

Principal Deputy Assistant Secretary Office of Management &
Director, Information Collection Clearance Division
U.S. Department of Education
Page 12 of 14
September 5, 2018

| | be able to reproduce it, or understand the steps involved in producing it" |
|---|---|
| "The GE regulations failed to take into account the abundance of research that links student outcomes with a variety of socioeconomic and demographic risk factors."[44] | 1. Fails to identify data sources<br>2. Fails to confirm and document the reliability of the data |
| "The GE regulations underestimated the cost of delivering a program and practices within occupations that may skew reported earnings. According to Delisle and Cooper, because public institutions receive State and local taxpayer subsidies, 'even if a for-profit institution and a public institution have similar overall expenditures (costs) and graduate earnings (returns on investment), the for-profit institution will be more likely to fail the GE rule, since more of its costs are reflected in student debt.'  Non-profit, private institutions also, in general, charge higher tuition and have students who take on additional debt, including enrolling in majors that yield societal benefits, but not wages commensurate with the cost of the institution."[45] | 1. Fails to present conclusions that are strongly supported by the data<br>  a. The Delisle and Cooper study cited by the Department does not support its conclusion that the GE regulations "underestimated the cost of delivering a program and practices within occupations that may skew reported earnings."<br>2. Fails to identify data sources |
| "In the case of cosmetology programs, State licensure requirements and the high costs of delivering programs that require specialized facilities and expensive consumable supplies may make these programs expensive to operate, which may be why many public institutions do not offer them.  In addition, graduates of cosmetology programs generally must build up their businesses over time, even if they rent a chair or are hired to work in a busy salon."[46] | 1. Fails to identify data sources<br>2. Fails to confirm and document the reliability of the data |
| "[S]ince a great deal of cosmetology income comes from tips, which many individuals fail to accurately report to the Internal Revenue Service, mean and median earnings figures produced by the Internal Revenue Service underrepresent the true earnings of many | 1. Fails to present conclusions that are strongly supported by the data<br>  a. The IRS tax gap study cited by the Department does not support the Department's specific conclusions about cosmetology graduates.  The |

---

[44]    Id.
[45]    Id.
[46]    Id.

Principal Deputy Assistant Secretary Office of Management &
Director, Information Collection Clearance Division
U.S. Department of Education
Page 13 of 14
September 5, 2018

| | |
|---|---|
| workers in this field in a way that institutions cannot control."[47] | study is from 2012 and covers tax year 2006 only.<br>2.  Fails to confirm and document the reliability of the data |
| "While the GE regulations include an alternate earnings appeals process for programs to collect data directly from graduates, the process for developing such an appeal has proven to be more difficult to navigate than the Department originally planned.  The Department has reviewed earnings appeal submissions for completeness and considered response rates on a case-by-case basis since the response rate threshold requirements were set aside in the AACS litigation.  Through this process, the Department has corroborated claims from institutions that the survey response requirements of the earnings appeals methodology are burdensome given that program graduates are not required to report their earnings to their institution or to the Department, and there is no mechanism in place for institutions to track students after they complete the program.  The process of Departmental review of individual appeals has been time-consuming and resource-intensive, with great variations in the format and completeness of appeals packages.[48] | 1.  Fails to present conclusions that are strongly supported by the data<br>   a.  Despite asserting that the alternate appeals process is "time-consuming and resource-intensive, with great variations in the format and completeness of appeals packages," the Department then "estimates that it would take Department staff [only] 10 hours per appeal to evaluate the information submitted."[49]<br>2.  Fails to "be accompanied by supporting documentation that allows an external user to understand clearly the information and be able to reproduce it, or understand the steps involved in producing it"<br>   a.  Since March 2018, NSLDN has attempted to obtain copies of institutions' alternate earnings appeals.[50] To date, the Department has not provided such information. |
| "We believe that the analysis and assumptions with respect to earnings underlying the GE regulations are flawed."[51] | 1.  Fails to draw upon peer-reviewed, scientific evidence-based research<br>2.  Fails to confirm and document the reliability of the data |
| "There are student costs and benefits associated with enrollment in a program that would have otherwise lost eligibility to participate in the title IV, HEA programs under the GE regulations; however, the actual | 1.  Fails to draw upon peer-reviewed, scientific evidence-based research<br>2.  Fails to identify data sources<br>3.  Fails to confirm and document the reliability of the data |

---

[47]     *Id.*
[48]     *Id.* at 40,174-75.
[49]     *Id.* at 40,179.
[50]     *See generally,* Complaint, *Nat'l Student Legal Def. Network v. U.S. Dep't of Educ.*, No. 1:18-cv-01209-TSC (D.D.C. May 23, 2018).
[51]     83 Fed. Reg. at 40,175.

Principal Deputy Assistant Secretary Office of Management &
Director, Information Collection Clearance Division
U.S. Department of Education
Page 14 of 14
September 5, 2018

| outcome for students enrolled in failing or zone programs under the GE regulations is unknown."[52] | |

*　　*　　*

Given the importance and immediacy of the public comment period for the NPRM proposing to rescind the Gainful Employment regulation in its entirety, and the lack of quality information that the Department is disseminating as a part of that process, NSLDN requests that the Department rescind the NPRM immediately and, if the Department desires, correct and reissue it with information that complies with the IQA.

Sincerely,

Robyn Bitner, Counsel[53]

---

[52]　*Id.* at 40,178.
[53]　Ms. Bitner is a member of the New York Bar only.  She is currently practicing in the District of Columbia under the supervision of members of the D.C. Bar while her D.C. Bar application is pending.

# U.S. Department of Education
# Information Quality Guidelines

## Introduction

Section 515 of the Treasury and General Government Appropriations Act for Fiscal Year 2001 (Public Law 106-554) directed the U.S. Office of Management and Budget (OMB) to issue government-wide guidelines that "provide policy and procedural guidance to Federal agencies for ensuring and maximizing the quality, objectivity, utility, and integrity of information (including statistical information) disseminated by Federal agencies." *Information*, as defined by OMB, includes any communication or representation of knowledge, such as facts or data, in any medium or form, including textual, numerical, graphic, cartographic, narrative, or audiovisual forms. *Dissemination* refers to any distribution of information to the public that is initiated or sponsored by a federal agency. (OMB, *Guidelines for Ensuring and Maximizing the Quality, Objectivity, Utility, and Integrity of Information Disseminated by Federal Agencies,* February 22, 2002, 67 FR 8452-8460).

In summary, OMB's guidelines, issued on February 22, 2002, direct agencies to:

- Develop and implement their own agency-specific information quality guidelines by October 1, 2002;
- Adopt a basic standard of quality (including objectivity, utility, and integrity) as a performance goal and incorporate the standard into the agency's operations;
- Develop a process for reviewing the quality of information to ensure quality before information is disseminated;
- Establish a process for affected persons to request correction of information that may not comply with OMB's or the agency's guidelines; and
- Report annually to the Director of OMB, beginning January 1, 2004, the number and nature of complaints received by the agency regarding the agency's compliance with its guidelines concerning the quality, objectivity, utility, and integrity of information, and how such complaints were resolved.

## Background

Information quality is important to the Department of Education because educators, researchers, policymakers, and the public use information that the Department disseminates for a variety of purposes**.** Thus, it is important that the information the Department disseminates be accurate and reliable.

The Department's Strategic Plan emphasizes the importance of information quality. For example, goal four of the six strategic goals is to "Transform Education into an Evidence-based Field." Under this goal, the Department seeks "to ensure that research funded or published by the Department is of the highest quality." The Department places priority on ensuring "… that high-quality research – whether or not it is funded by the Department – is synthesized, publicized, and disseminated widely."

Exh. A

1

The Department also relies on high quality information in the administration of its grant programs.  For example, Objective 1.1 under the Strategic Plan requires the Department to "…link federal education funding to accountability for results." Consequently, programs that cannot demonstrate evidence of effectiveness will be candidates for reform or elimination.   High quality information is required to demonstrate evidence of effective programs.  To make sound decisions, the Department intends to accept and use only information that is accurate and reliable.

To serve the public, the Department of Education prepares and disseminates information products that describe the condition of American education and the Department's policies, programs, and services.  The Department also disseminates profiles of the learner populations served by Department programs, evaluations of Department programs, and research products describing what works in American education. In addition, the Department reports statistical data describing the educational achievement, attainment, and the demographic and socioeconomic characteristics of America's students; the characteristics of the education labor force in the United States; the financing of education in the United States; and international comparisons of education systems and their students.  The Department disseminates most of its information products in both printed and electronic formats, as well as in oral presentations.  Many information products are announced on the Department's Web site (www.ed.gov), where they can be accessed and downloaded.

# Purpose and Scope

Consistent with the guidance from OMB, the Department of Education's Information Quality Guidelines (Guidelines) described below reflect the Department's policy and procedures for reviewing and substantiating the quality of information it disseminates, (*e.g.*, reports, studies, and summaries), as well as provide an administrative mechanism allowing affected persons to seek and obtain, where appropriate, correction of information not complying with the Guidelines. These Guidelines, along with those issued by OMB, represent a performance goal for the Department and are intended only to improve the internal management of the Department.  They do not create any private right of action to be used by any party against the government in a court of law or in an administrative hearing.

The Guidelines are applicable to information that the Department of Education disseminates on or after October 1, 2002, including the review of information to ensure quality before it is disseminated to the public.  Some previously released information products continue to be used for decision-making or are relied upon by the Department and the public as official, authoritative, government information; this information is, in effect, constantly being re-disseminated and are thus subject to these Guidelines.  Previously released information products that do not meet these criteria are considered archived information and thus are not subject to these Guidelines.

In addition, individual offices within the Department of Education may have more detailed guidelines that are tailored to specific information needs.  An example of program-specific guidelines are the National Center for Education Statistics (NCES) Statistical Standards, which may be accessed at the following url: **http://nces.ed.gov/statprog/**.  Other individual offices within the Department of Education also may develop guidelines tailored to their specific needs;

Exh. A

2

however, individual office guidelines would be consistent with the Department of Education Guidelines described below.

Under these Guidelines, information disseminated by the Department of Education is divided into four categories:

- ***General Information about Education Programs***, such as fact sheets, descriptions of programs and services and guidance on who is eligible and how and where to apply for services or assistance.  General information might also include public service reports on evaluations of specific programs and services, and descriptions of findings.
- ***Research Studies and Program Evaluation Information***, such as detailed reports of research findings and methodologies and technical reports describing the procedures employed and the results of program evaluations.
- ***Administrative and Program Data***, such as aggregates of records from schools, school districts, and states.
- ***Statistical Data***, such as data collections of nonadministrative data and special purpose surveys that are designed to fill data gaps or information needs.

These Guidelines, however, do not govern all information of the Department, nor do they cover all information disseminated by the Department.  For example, the Guidelines generally **do not cover**:

- Internal information such as employee records;
- Internal procedural, operational, or policy manuals prepared for the management and operations of the Department of Education that are not primarily intended for public dissemination;
- Information collected or developed by the Department that is not disseminated to the public, including documents intended only for inter-agency or intra-agency communications;
- Research findings and other information published by grantees, unless the Department –
    - Represents, uses, or relies upon the information as the official position of the Department, or in support of the official position of the Department;
    - Has authority to review and approve the information before release; or
    - Directs that the information be disseminated;
- Opinions that are clearly identified as such, and that do not represent facts or the agency's views;
- Electronic links to information on other Web sites;
- Correspondence with individuals;
- Responses to requests for information under the Freedom of Information Act, the Federal Advisory Committee Act, and the Privacy Act;
- Press releases, unless they contain new substantive information that was not previously released;
- Congressional testimony that includes data that has previously been disseminated;
- Comments received from the public in response to *Federal Register* notices;
- Distributions intended to be limited to subpoenas or adjudicative processes, *i.e.,* the findings and determinations made in the course of adjudications;

Exh. A

3

- Information collected during the course of a Departmental investigation that is not intended to be disseminated to the public, *e.g.,* data collected through resolution of an OCR or OIG investigation; and
- Archival records, including previously released information products that are not being relied upon, used for decision-making, or held out as authoritative data.

# Information Quality

These Guidelines assess information quality using three factors: utility, objectivity, and integrity. These elements are intended to ensure that information the Department disseminates is useful, accurate, reliable, unbiased, and secure. Department staff will treat information quality as integral to the creation, collection, maintenance, and dissemination of information, and will review products before they are disseminated to ensure that they are consistent with these Guidelines.  In particular, information products from the Department will follow the *Guide to Publishing at the U.S. Department of Education*, and all clearance submissions under the Paperwork Reduction Act will explain how the proposed collection of information will yield high quality, objective, and useful data, consistent with OMB's guidelines.  Furthermore, the Guidelines provide that the level of quality assurance for information must be tied to its level of importance.  *Influential Information,* that is information that will or does have a clear and substantial impact on public policies or private sector decisions, must meet a higher level of quality as described on page 9 of these Guidelines.

## Utility

*Utility refers to the usefulness of the information to its intended users.  Utility is achieved by staying informed of information needs and developing new products and services where appropriate.  To maximize the utility of influential information, care must be taken in the review stage to ensure that the information can be clearly understood and, where appropriate and to the extent practical, an external user of the information can reproduce the steps involved in producing the information.*

Ultimately, the Department intends to ensure that the information it disseminates meets the needs of intended users. All information products should be grammatically correct and clearly written in plain English. The target audience should be clearly identified, and the product should be understandable to that audience.

To ensure the usefulness of Department products, all information products should provide information that will help the Department fulfill its mission "to ensure equal access to education and to promote educational excellence throughout the nation."  When appropriate, Department products should include contact information for users who seek clarification or further information, or who want to provide feedback.

In particular—
- ***General Information*** should provide clear and readable descriptions of the Department's programs and services and, where applicable, guidance and assistance, including who is eligible and how and where to apply for services or assistance.  It also may include information pertaining to evaluations of specific programs and services, and descriptions of findings.

Exh. A

- ***Research Studies and Program Evaluations*** should be designed and reviewed to fill the information needs that are identified through internal review, legislative mandates, or input from data users outside the Department.
- ***Administrative and Program Data,*** *e.g.,* aggregate data (or information) derived from records at the school, school district, and state levels, should be carefully described and documented in all reports and products released by the Department.
- ***Statistical Data,*** *e.g*., data collections of non-administrative data and special purpose surveys should be designed to fill data gaps or information needs that are identified through internal review, legislative mandates, or input from data users outside the Department, and should be reviewed for how well they fulfill that purpose.

The usefulness of information the Department disseminates will be evaluated from the perspective of the Department, educators, education researchers, policymakers, and the public. The Department relies upon internal reviews and analyses, along with feedback from advisory committees, educators, education researchers, policymakers, and the public to achieve this. Consistent with OMB's guidance, the Department's goal is to maximize the usefulness of the information and minimize the cost to the government and the public. When disseminating its information products, the Department will utilize varied dissemination channels so that the public, education researchers, and policymakers can locate Department information in an equitable and timely fashion.

## Objectivity

*Objectivity refers to the accuracy, reliability, and unbiased nature of information. It is achieved by using reliable information sources and appropriate techniques to prepare information products. Objectivity involves both the content and the presentation of the information. Content should be complete, include documentation of the source of any information used, as well as, when appropriate, a description of the sources of any errors in the data that may affect the quality of the information product. The presentation of the information should be clear and in a proper context so that users can easily understand its meaning.*

The Department strives to present information to the public in an accurate, clear, complete, and unbiased manner. In keeping with the OMB Information Quality Guidelines, all information products should undergo editorial and technical peer review to assist the Department in meeting this performance goal.

### General Information
Department of Education information products should be appropriate for the target audience. Each product should:

1. Clearly state the goals or purpose of the information product;

2. Include an unbiased presentation of the topic in question;

3. If applicable, draw upon peer-reviewed, scientific evidence-based research that is appropriately documented;

4. Clearly identify data sources, if applicable; and

5. Confirm and document the reliability of the data, and acknowledge any shortcomings or explicit errors in any data that is included.

Exh. A

5

### *Research and Evaluation Information*

Department of Education research and evaluation information products should, at a minimum:

1. Clearly state the goals or purpose of the topic in question;

2. Pose the research or evaluation question in a balanced and unbiased manner;

3. Provide an unbiased test of the question;

4. Have a research study approach or data collection technique that is well thought out, designed to use state of the art methodologies in the data collection, and be clearly described in the study documentation;

5. Present conclusions that are strongly supported by the data;

6. Clearly identify data sources, if applicable;

7. Confirm and document the reliability of the data, and acknowledge any shortcomings or explicit errors in any data that is included; and

8. Undergo peer review.

Department of Education research and evaluation information products documenting cause and effect relationships or evidence of effectiveness should meet the quality standards that will be developed as part of the *What Works Clearinghouse.*

### *Administrative and Program Data*

The Department of Education reports data that rely upon information provided by third parties. These data draw upon aggregates from student record systems or other administrative data (*e.g.*, universe studies, including censuses, and other reports based on aggregate administrative data). These data rely upon information provided by third parties. Because of this, the Department does not have full control over the quality of the reported data; the Department intends to, however, identify the source of the information and any shortcomings or limitations of the data if we rely upon it for decision-making purposes.   This will facilitate the public's understanding of the strengths and potential weaknesses of these data.  Furthermore, as an additional assurance of quality, these data should meet the criteria that are being developed as part of an ongoing Department-wide data standardization and coordination initiative. At a minimum, these standards will require the following:

1. In formulating a data collection plan the goals of the study should be clearly described;

2. The subjects to be studied and the data to be collected should be clearly defined, using broadly understood concepts and definitions that are consistent with Department data definition handbooks;

3. The research study approach or data collection techniques should be well thought out and designed to use state-of-the-art methodologies in the data collection, and should be clearly described in the study documentation;

4. In designing the work, every effort should be made to minimize the amount of time required for responding institutions;

Exh. A

5. The source of research information or data should be reliable. Data should be collected with survey instruments that have been properly developed and tested;

6. Response rates should be monitored during data collection.  When necessary, appropriate steps should be taken to ensure the respondents are representative of the population;

7. When applicable, care should be taken to ensure the confidentiality of personally identifiable data, as required by law, during the collection, processing, and analysis of the data;

8. Upon completion of the work, the findings and data should be processed in a manner sufficient to ensure that the data are edited to help ensure that the data are accurate and reliable;

9. The findings and data collection should be properly documented and stored, and the documentation should include an evaluation of the quality of the data with a description of any limitations of the data. In particular, any known limitations of the information should be documented (*e.g*., missing values, amount of nonresponse);

10. The analysis should be selected and implemented to ensure that the data are correctly analyzed using modern statistical techniques suitable for hypothesis testing. Techniques may vary from simple tabulations and descriptive analysis to multivariate analysis of complex interrelationships.  Care should be taken to ensure that the techniques are appropriate for the data and the questions under inquiry;

11. All work should be conducted and released in a timely manner;

12. Reports using these data should identify the source(s) of the information, including a citation. Reports should also include:

    a) The reason the information is provided, its potential uses, and cautions as to inappropriate extractions or conclusions.

    b) Descriptions of any statistical techniques or mathematical operations applied to the data.

    c) The identification of other possible sources of potentially corroborating or conflicting information; and

13.  Prior to dissemination, all reports, data, and documentation should undergo editorial and technical review to ensure accuracy and clarity.


***Statistical Data***

Department of Education reports and data collections that draw upon sample survey data should be clearly written, and should follow these Guidelines:

1. In formulating a data collection plan, the goals of the study should be clearly described;

2. The subjects to be studied and the data to be collected should be clearly defined, using broadly understood concepts and definitions that are consistent with Department data definition handbooks;

3. The research study approach or data collection techniques should be well thought out and designed to use state-of-the-art methodologies in the data collection and should also be clearly described in the study documentation;

4. In designing the work, every effort should be made to minimize the amount of time required for study participants;

Exh. A

5. The source of data should be reliable. The sample should be drawn from a complete list of items to be tested or evaluated, and the appropriate respondents should be identified, correctly sampled, and queried with survey instruments that have been properly developed and tested;

6. Response rates should be monitored during data collection. When necessary, appropriate steps should be taken to ensure that the respondents are a representative sample;

7. Care should be taken to ensure the confidentiality of personally identifiable data, as required by law, during research/data collection, processing, and analysis of the resulting data;

8. Upon completion of the work, the data should be processed in a manner sufficient to ensure that the data are cleaned and edited to help ensure that the data are accurate and reliable;

9. The findings and data collection should be properly documented and stored, and the documentation should include an evaluation of the quality of the data with a description of any limitations of the data. In particular, any known limitations of the information should be documented (*e.g.*, missing values, amount of nonresponse);

10. Data should be capable of being reproduced or replicated based on information included in the documentation, such as:

    a) The source(s) of the information;

    b) The date the information was current;

    c) Any known limitations on the information;

    d) The reason that the information is provided;

    e) Descriptions of any statistical techniques or mathematical operations applied to source data; and

    f) Identification of other sources of potentially corroborating or conflicting information.

11. If secondary analysis of data is employed, the source should be acknowledged, the reliability of the data should be confirmed and documented, and any shortcomings or explicit errors should be acknowledged (*e.g.,* the representativeness of the data, measurement error, data preparation error, processing error, sampling errors, and nonresponse errors);

12. The analysis should be selected and implemented to ensure that the data are correctly analyzed using modern statistical techniques suitable for hypothesis testing. Techniques may vary from simple tabulations and descriptive analysis to multivariate analysis of complex interrelationships. Care should be taken to ensure that the techniques are appropriate for the data and the questions under inquiry;

13. Reports should include the reason the information is provided, its potential uses, and cautions as to inappropriate extractions or conclusions, and the identification of other sources of potentially corroborating or conflicting information;

14. Descriptions of the data and all analytical work should be reported in sufficient detail to ensure that the findings could be reproduced using the same data and methods of analysis; this includes the preservation of the data set used to produce the work;

15. Prior to dissemination all reports, data, and documentation should undergo editorial and technical review to ensure accuracy and clarity. Qualified technical staff and peers both inside and outside the Department should do the technical review;

16. All work should be conducted and released in a timely manner; and

17. There should be established procedures to correct any identified errors.  These procedures may include the publication of errata sheets, revised publications, or Web postings.

## Integrity

*Integrity refers to the security or protection of information from unauthorized access or revision. Integrity ensures that the information is not compromised through corruption or falsification.*

The Department strives to protect the information it collects, uses, and disseminates to the public from unauthorized disclosure, alteration, loss, or destruction.  Statutory and administrative guidelines to protect the integrity of Department information include the following:

- Privacy Act;
- Freedom of Information Act;
- OMB Circulars A-123, A-127, and A-130;
- Federal Policy for the Protection of Human Subjects;
- Family Educational Rights and Privacy Act;
- Computer Security Act of 1987;
- Government Information Security Reform Act; and
- National Education Statistics Act, as amended by the USA Patriot Act.

Under the Privacy Act, the Department safeguards personally identifiable information that it gathers and maintains about individuals in a system of records.  The Department is also highly protective of administrative records and sample survey data that include personally identifiable information, especially survey data that are collected under pledges of confidentiality.

Under the Computer Security Act of 1987, the Department of Education has identified all federal computer systems that contain sensitive information and has implemented security plans to protect these systems, so as to protect sensitive information against loss, misuse, disclosure or modification.  In this context, sensitive information includes data covered under the Privacy Act and information that could affect the conduct of federal programs.

## Influential Information

Government information that is particularly influential needs to meet higher quality standards, and in particular must be reproducible. Per the OMB guidelines, information is designated as influential if the Department determines that the information is reasonably likely to have a clear and substantial impact on public policies or private sector decisions if disseminated. Scientific, financial, and statistical information all may be considered influential.  Individual programs within the Department of Education may designate certain classes of scientific, financial, and statistical information as influential.

For example, institutional data on the total number of student borrowers who enter repayment on Stafford loans during a specific fiscal year, and related data on the subset of students who default before the end of the next fiscal year are used in the calculation of cohort loan default rates of Stafford loan borrowers at each postsecondary institution.  These default rates are compared to established thresholds for high and low default rates, resulting in sanctions for institutions with high default rates and reduced administrative burden for institutions with low default rates.

Exh. A

Given this use, these data and the calculations used in computing the rates and in setting the thresholds are influential. Similarly, the data and formulas used in determining program allocation of funds in areas such as special education, adult education, and Title I are influential.

As specified in the OMB guidelines, influential information must be accompanied by supporting documentation that allows an external user to understand clearly the information and be able to reproduce it, or understand the steps involved in producing it. With respect to original and supporting data related thereto, the Department will assure reproducibility for such data according to commonly accepted scientific, financial, or statistical standards for that type of data, taking into account any ethical and confidentiality constraints.  In the case of influential analytic results, the mathematical and statistical processes used to produce the report must be described in sufficient detail to allow an independent analyst to substantially reproduce the findings using the original data and identical methods.  In situations where the public cannot access the data and methods due to other compelling interests such as privacy, intellectual property or other confidentiality protections, the Department will apply especially rigorous robustness checks to analytic results and document what checks were undertaken.

# Information Correction Requests and Appeals

Effective October 1, 2002**,** the Department of Education will allow any affected person to request the correction of information the Department disseminates that does not comply with applicable OMB and Department of Education information quality guidelines.  An affected person is an individual or an entity that may use, benefit or be harmed by the disseminated information at issue.

Most Department information products include the names of knowledgeable staff that can assist users in understanding the information presented, and in determining whether there is an error that warrants action using the correction process described in this section.  Users of the Department's information should consult with the contact person listed in the product before filing a formal request for correction.

## Information Correction Requests

In the Department of Education's correction request process, the burden of proof rests with the requester.  An affected person who believes that information the Department disseminates does not adhere to the information quality guidelines of OMB or the Department, or an office of the Department that has issued program-specific guidelines, and who would like to request correction of specific information, needs to provide the following information:

- Identification of the requester (*i.e.,* name, mailing address, telephone number, and organizational affiliation, if any);
- A detailed description of the information that the requester believes does not comply with the Department's or OMB's guidelines, including the exact name of the data collection or report, the disseminating office and author, if known, and a description of the specific item in question;
- Potential impacts on the requester from the information identified for correction (*i.e.,* describe the requestor's interest in the information and how the requestor is affected by the information in question); and

Exh. A

- An explanation of the reason(s) that the information should be corrected (*i.e.*, describe clearly and specifically the elements of the information quality guidelines that were not followed).

This information should be provided to the Principal Deputy Assistant Secretary for the Office of Management at the following address:

> Principal Deputy Assistant Secretary
> Office of Management
> U.S. Department of Education
> RE: Information Quality Request
> Room 2W311, LBJ
> 400 Maryland Avenue, SW
> Washington, DC 20202

Alternatively, requesters may submit e-mail requests to the following address: "OMInformationQualityRequests@ed.gov."  Requesters should indicate that they are submitting an Information Quality Request in the subject line of the e-mail.

## Review

The Principal Deputy Assistant Secretary (PDAS) will review the request and determine whether it contains all the information required for a complaint. If the request is unclear or incomplete, the Department will seek clarification from the requester.

If the request is clear and complete, the PDAS will forward it to the appropriate program office(s) for a response to the requester. The responsible office(s) will determine whether a correction is warranted, and if so, what corrective action it will take.  Any corrective action will be determined based on the nature and timeliness of the information involved, as well as the significance of the error on the use of the information, the magnitude of the error, and the cost of undertaking a correction.

Comments about information on which the Department has sought public comment, such as rulemaking or studies cited in a rulemaking, will be responded to through the public comment process, or through an individual response if there was no published process for responding to all comments.  The Department may choose to provide an earlier response, if doing so is appropriate, and will not delay issuance of the final action in the matter.

The Department is not required to change the content or status of information simply based on the receipt of a request for correction. The Department may reject a request that appears to be made in bad faith or without justification, and is only required to undertake the degree of correction that is appropriate for the nature and timeliness of the information involved.  In addition, the Department need not respond substantively to requests that concern information not covered by the information quality guidelines.

Exh. A

## Response

The Department will respond to all requests for correction within 60 calendar days of the PDAS' receipt of the request, including requests that the Department elects not to process further.  For requests that merit review –

- If the request is clear and complete, the Department's response will explain the findings of the review, or will inform the requester if more time is needed to complete the review, the reason(s) for the additional time, and an estimate of the time it will take to respond.  The appropriate program office will be responsible for determining what action is necessary and, if an error was made, it will determine the appropriate level of correction.

- If the request is incomplete or unclear, the PDAS will seek clarification from the requester.  In the case of an unclear or incomplete request, the requester may submit additional clarifying information if he or she so chooses.  However, the deadline for the Department's review and response will be based upon the date the clarifying information is received.

Once a decision is made, the response will explain to the requester that he or she has a right to appeal the decision.  Copies of all Department correspondence related to Information Quality Requests will be maintained by the PDAS.

## Appeals

If a requester is not satisfied with the Department's decision on the request (including the corrective action, if any), he or she may appeal to the Department's Principal Deputy Assistant Secretary within thirty (30) calendar days of receipt of the Department's decision.  This administrative appeal must include a copy of the initial request, a copy of the Department's decision, and a letter explaining why he or she believes the Department's decision was inadequate, incomplete, or in error.

This appeal information should be provided to the Department's Principal Deputy Assistant Secretary at the following address:

> Principal Deputy Assistant Secretary
> Office of Management
> U.S. Department of Education
> RE: Information Quality Request
> Room 2W311, LBJ
> 400 Maryland Avenue, SW
> Washington, DC 20202

Alternatively, requesters may submit an appeal by e-mail to the following address: "OMInformationQualityRequests@ed.gov."

Requesters should indicate that they are submitting an Information Quality Appeal in the subject line of the e-mail. Such e-mail requests must include all of the information specified for an appeal submitted by regular mail.

Exh. A

The Department will ensure that all appeals are subjected to an impartial review that is conducted by parties other than those who prepared the Department's decision.   The Department will respond to all appeals within 60 calendar days of the Principal Deputy's receipt of the appeal, or will inform the requester if more time is needed to complete the review of the appeal, and the reason(s) for the additional time.

Exh. A

9/4/2018
Case 1:21-cv-00573 Document 1-3 Filed 03/04/21 Page 29 of 31
DeVos misrepresents the evidence in seeking gainful employment deregulation | Urban Institute



# URBAN
### INSTITUTE

## Urban Wire :: Education and Training

*The voices of Urban Institute's researchers and staff*



# DeVos misrepresents the evidence in seeking gainful employment deregulation



**Sandy Baum** | *August 22, 2018*

Secretary of Education Betsy DeVos and the Trump administration have announced their intention to eliminate the gainful employment (GE) regulations, a move that would strip students and taxpayers of protection from exploitation by postsecondary institutions that do not provide meaningful educational opportunities.

To justify this change, the Department of Education has misrepresented my research, creating a misleading impression of evidence-based policymaking. The Department cites

DeVos misrepresents the evidence in seeking gainful employment deregulation

<span style="color:red">Exh. B</span>

9/4/2018
Case 1:21-cv-00573 Document 1-8 Filed 03/04/21 Page 30 of 31
DeVos misrepresents the evidence in seeking gainful employment deregulation

The GE rules, which cover all programs in the for-profit sector and nondegree programs at public and private nonprofit institutions, restrict the flow of federal dollars to programs with graduates who don't earn enough relative to their loan payments. The regulations are designed to prevent institutions from taking advantage of students who spend time and energy in programs where they accumulate large amounts of debt that they are unable to ever repay, leaving the taxpayers on the hook for the bill and the students without a decent education.

The current rule requires that the median debt level for a program's graduates not exceed 20 percent of the discretionary income of the mean or median graduate, whichever is higher. To make the regulations less stringent, the rule's authors added a second standard, allowing programs to qualify if they meet the first standard *or* if the average graduate's debt payment is less than or equal to 8 percent of their total income.

# Our examination of a range of evidence about reasonable debt burdens for students would best be interpreted as supporting a stricter standard.

In its move to dismantle the regulation, the administration cites a paper on manageable student debt levels I co-authored with Saul Schwartz in 2008 that raises questions about the 8 percent threshold. In the notice of proposed rulemaking, the Department of Education claims that "We base our proposal to rescind the GE regulations on a number of findings, including research results that undermine the validity of using the regulations' debt-to-earnings (D/E) rates measure to determine continuing eligibility for title IV participation."

They are correct that we were skeptical of this standard for determining affordable payments for individual borrowers, but incorrect in using that skepticism to defend repealing the rule. In fact, our examination of a range of evidence about reasonable debt burdens for students would best be interpreted as supporting a stricter standard.

In brief, our paper looked at a variety of potential reference points for setting guidelines for how much individual students could reasonably afford to spend repaying their loans. Noting that the common standard from the mortgage industry of 8 percent of income

9/4/2018
Case 1:21-cv-00573-Document 1-8 Filed 03/04/21 Page 31 of 31
DeVos misrepresents the evidence in seeking gainful employment deregulation

We concluded that no borrower could reasonably afford to spend more than 18–20 percent of their income on student loans and proposed 20 percent of discretionary income (income exceeding 150 percent of the poverty level) as a standard on which to base an income-based loan repayment plan. (This became the standard for GE.)

Citing my research and its judgment that 8 percent of income is not the best way to measure the affordability of loan payments as a reason to rescind the rules is illogical. The GE rules are, if anything, too permissive.

Our research set a guideline for a level of debt payments *no individual student* should exceed. Under GE, half of a program's graduates could exceed this limit before sanctions would kick in. If this research is going to be brought into the debate, it should be used to support eliminating eligibility for federal student aid for more programs—not eliminating the rules.

The Trump administration expresses concerns about blaming institutions for the outcomes of their students, in light of the reality that students' characteristics, in addition to their educational attainment levels, contribute to their earnings levels. But these rules are in place not to accommodate institutions, but to diminish the number of students who spend time and money in programs that have almost no chance of helping them meet their goals and to protect taxpayers from being left holding the bag when such students are unable to repay the loans they took to enroll in these programs.

A true evidence-based approach to policymaking would do more than cite a few phrases from a scholarly article. It would carefully review evidence about the causes and costs of students enrolling in institutions and programs that fail large shares of their students. It would design policies that would ameliorate these problems, strengthening existing policies and making them more effective rather than erasing years of hard-won progress.

Education Secretary Betsy DeVos, second from left, joined by Education Department Budget Service Director Erica Navarro, left, turns to speaks to people behind her before she testifies on Capitol Hill in Washington, Wednesday, May 24, 2017. Photo by Carolyn Kaster/AP.

## SHARE THIS PAGE

https://urbn.is/2OSzbLS       SHARE

DeVos misrepresents the evidence in seeking gainful employment deregulation

Exh. B